12-3089-cv
Lynch v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————

August Term, 2012

(Argued: May 16, 2013       Decided: November 15, 2013)

Docket No. 12-3089-cv

—————————

PATRICK J. LYNCH, as President of the Patrolmen's Benevolent Association of the City of New York, Inc., PATROLMEN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.,

*Plaintiffs-Appellants*,

—v.—

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, RAYMOND W. KELLY, Police Commissioner of the New York City Police Department,

*Defendants-Appellees*.

—————————

Before:
RAGGI and STRAUB, *Circuit Judges*, COGAN, *District Judge*[*]

—————————

Appeal from an award of summary judgment to defendants on plaintiffs'

Fourth Amendment challenge to the New York City Police Department's policy

---

[*] The Honorable Brian M. Cogan, of the United States District Court for the Eastern District of New York, sitting by designation.

1

of administering a breathalyzer test to any officer who discharges a firearm resulting in death or personal injury. Plaintiffs challenge the district court's determination that the policy is constitutionally reasonable under the "special needs" doctrine, arguing that the policy does not serve a primary purpose distinct from normal criminal law enforcement, and, even if it did, that any special needs are sufficiently outweighed by officers' privacy interests as to preclude warrantless, suspicionless breathalyzer testing.

AFFIRMED.

———————

EILEEN PENNER (Andrew L. Frey, Mayer Brown LLP, New York, New York; Michael T. Murray, Michael T. Murray & Associates, P.C., New York, New York, *on the brief*), Mayer Brown LLP, Washington, D.C., *for Appellants Patrick J. Lynch and Patrolmen's Benevolent Association of the City of New York, Inc.*

JANE L. GORDON (Edward F.X. Hart, Alan Schlesinger, *on the brief*), of Counsel, *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, *for Appellees The City of New York, New York City Police Department and Raymond W. Kelly*.

———————

REENA RAGGI, *Circuit Judge*:

Plaintiffs, the Patrolmen's Benevolent Association of the City of New York, Inc., a union representing New York City's 35,000 police officers (except certain

2

ranks of detective), and its President, Patrick J. Lynch, appeal from an award of summary judgment entered on June 28, 2012, in the United States District Court for the Southern District of New York (George B. Daniels, *Judge*) in favor of defendants, the City of New York, the New York City Police Department, and Police Commissioner Raymond W. Kelly (collectively, the "NYPD"), on plaintiffs' Fourth Amendment challenge to NYPD Interim Order 52 ("IO-52"), which requires the administration of a breathalyzer test to any officer whose discharge of his firearm within New York City results in death or injury to any person. See Palladino v. City of New York, 870 F. Supp. 2d 350 (S.D.N.Y. 2012). The case has previously been before this court. In Lynch v. City of New York ("Lynch I"), 589 F.3d 94 (2d Cir. 2009), we affirmed the denial of plaintiffs' motion preliminarily to enjoin the operation of IO-52, concluding that plaintiffs were unlikely to succeed on the merits of their Fourth Amendment challenge because IO-52 testing was supported by "special needs." Id. at 100–05.

While the district court relied on Lynch I's special needs analysis in granting judgment to the NYPD, plaintiffs submit that Lynch I's rulings do not control our summary judgment review. See Brody v. Vill. of Port Chester, 345 F.3d 103, 110 (2d Cir. 2003). They argue that the record does not in fact support,

3

much less compel, the conclusion that the primary purpose of IO-52 testing is special needs distinct from normal criminal law enforcement. In any event, plaintiffs contend that any such special needs do not sufficiently outweigh officers' privacy interests to make warrantless, suspicionless breathalyzer testing constitutionally reasonable. Even assuming that a panel reviewing a summary judgment award is free to revisit not only the merits predictions of a prior panel, but also that panel's resolution of purely legal issues, we see no reason to depart from Lynch I's sound legal analysis of the special needs doctrine. On our own review of an expanded record as well as relevant precedent, we conclude that IO-52 testing is reasonable under the special needs doctrine and that plaintiffs' Fourth Amendment challenge fails as a matter of law. Accordingly, we affirm the award of summary judgment in favor of the NYPD.

## I. **Background**

### A. NYPD Interim Order 52

#### 1. Circumstances Giving Rise to IO-52

IO-52 has its origins in events occurring in Queens, New York on November 26, 2006, when, during an undercover operation, NYPD officers shot and killed a man named Sean Bell and wounded two of his companions. In the

4

wake of public criticism, the NYPD convened a Committee for Review of Undercover Procedures, chaired by Charles V. Campisi, Chief of the NYPD Internal Affairs Bureau ("IAB"), which is charged with investigating police misconduct. The Committee ultimately released 19 recommendations, including a recommendation for mandatory breathalyzer testing of NYPD officers involved in shootings that resulted in death or personal injury. On September 30, 2007, the Police Commissioner implemented that recommendation by issuing IO-52, which sets forth procedures for alcohol testing "when a uniformed member of the [NYPD], on or off duty, is involved in a firearms discharge within New York City which results in injury to or death of a person." IO-52, Joint Appendix ("J.A.") 45.[1]

### 2. Stated Purpose of IO-52

The stated purpose of IO-52 is "[t]o ensure the highest levels of integrity at the scene of police involved firearms discharges which result in injury to or death of a person." IO-52, J.A. 45. As explained further by Chief Campisi in opposing plaintiffs' motion for a preliminary injunction, IO-52 serves (1) to

---

[1] In February 2011, the NYPD replaced IO-52 with Patrol Guide Procedure No. 212-109, which is substantially identical to IO-52 in all aspects relevant to this litigation. Like the parties, we refer to the challenged policy throughout this opinion by its original designation.

protect "the integrity of the NYPD"; (2) to protect "the safety of the public and NYPD officers"; (3) to deter "alcohol intoxication by NYPD who are carrying firearms"; and (4) to assure "the public that one of the most important and daunting powers of the police, the power to apply deadly force when necessary, is not being abused or used by officers who are under the influence of alcohol." Campisi Decl. ¶ 70, J.A. 104.

### 3. IO-52 Testing Procedures

Toward these ends, IO-52 mandates, <u>inter alia</u>, that a Patrol Services Bureau Duty Captain or Inspector respond to the scene of any police shooting in New York City resulting in death or personal injury, advise each officer who discharged a firearm that he will be tested for alcohol consumption, and ensure that each such officer "remain[s] on the scene when feasible and consistent with safety (<u>i.e.</u>, hospitalization not immediately required)" until an IAB Duty Captain arrives to administer a portable breathalyzer test. IO-52, J.A. 45.

Upon arrival, the IAB Duty Captain must administer a breathalyzer test to each officer who discharged his firearm in a "private setting (<u>e.g.</u>, Nearest Department facility [or] Department auto being used by the supervisor concerned)" and in "a dignified, respectful fashion." IO-52, J.A. 46. If the

6

breathalyzer test, which takes about five minutes to complete, produces a reading of less than .08—the legal limit for operating a motor vehicle under N.Y. Veh. & Traf. Law § 1192—IO-52 requires no further testing. If the reading is .08 or greater, however, the officer must be transported to an IAB testing location for a second, more alcohol sensitive test on an Intoxilyzer machine. That process, which includes questioning the officer about recent alcohol and drug use, is recorded on videotape. If the Intoxilyzer reading exceeds .08, the videotape is provided to the IAB Duty Captain, who follows applicable procedures to "safeguard [it] for evidentiary purposes." IO-52, J.A. 46. The IAB Duty Captain then determines whether the officer is unfit for duty due to intoxication.

### 4.    NYPD Alcohol Use Guidelines

IO-52 testing operates within a larger administrative context addressing alcohol use by NYPD officers. NYPD Patrol Guide Procedures ("PG") require officers to be "fit for duty at all times, except when on sick report." PG 203–04, J.A. 111. Consistent with this requirement, officers are instructed that they "SHOULD NOT be in possession of their firearms if there is any possibility that they may become unfit for duty due to the consumption of intoxicants." Id. (emphasis in original). NYPD supervisors are authorized and, indeed, obligated

7

to remove firearms from any officer "who appears unfit for duty due to intoxication." PG 206–12, J.A. 131. An officer who is "unfit for duty due to excessive consumption and intoxication from alcohol while armed with a firearm" is subject to the administrative charge of being "Unfit for Duty While Armed," with "strict punitive sanctions" if the charge is sustained at a disciplinary proceeding. PG 203–04, J.A. 111. An officer's "misuse of a firearm while unfit for duty due to excessive consumption of, and intoxication from, alcohol will result in that [officer's] termination from the [NYPD]." Id.[2]

5.    NYPD Procedures for Investigating Police Shootings

IO-52 testing also operates within a larger set of procedures whereby the NYPD investigates every incident in which an officer discharges his firearm other than at the firing range. See PG 212–29, J.A. 134 ("Firearms Discharge by Uniformed Member of the Service"); PG 212–53, J.A. 144 ("Command Responsibilities When a Person Dies or Sustains a Serious Injury in Connection with Police Activity"). These procedures require that the initial investigation

_____

[2] The NYPD addresses officers' various problems—including alcohol use—proactively as well as reactively, maintaining a confidential counseling program that interviewed approximately 600 officers from 2005–07, the years immediately prior to IO-52's implementation. During that same time period, between 10 and 16 off-duty officers were arrested each year for drunk driving. Four police suicides during that period were linked in some way to alcohol use.

8

into a police shooting be conducted by an NYPD officer with the rank of captain or higher, who must prepare a narrative report of the relevant events, which may or may not also contain a preliminary evaluation of whether the shooting comported with NYPD guidelines and a recommendation as to possible corrective or disciplinary action. At the same time, procedures require the shooting site to be treated in the same manner as a crime scene. As explained by Chief Campisi, this is done "to assure the public and the NYPD's own officers that the truth of the shooting will be brought out and appropriate actions taken," Campisi Decl. ¶ 45, J.A. 99, and because "whether criminal charges against anyone will result cannot be determined until the investigation is completed," id. ¶ 33, J.A. 96.

Within 90 days of the shooting, or as soon as possible thereafter, a commanding officer must complete a final report of findings and recommendations, including therein the Medical Examiner's report (if applicable), a ballistics report, a summary of the shooting officer's statements, and any applicable IAB, District Attorney, or grand jury findings. The matter is then reviewed further first by the Borough Firearms Discharge Advisory Board and then by the Chief of the Department's Firearms Discharge Review Board to

9

decide what action, if any, should be taken. Such action may provide for "additional training," "disciplin[e]," or, "in relatively rare circumstances," criminal prosecution. Id. ¶ 46, J.A. 99.

### 6. Reported Frequency and Perceptions of IO-52 Testing

Plaintiffs submit that since the 2007 implementation of IO-52, NYPD officers have been subjected to IO-52 breath testing on approximately 15 to 20 occasions. No tested officer has exceeded the .08 threshold on Intoxilyzer testing, nor has any officer been criminally charged in connection with the shootings at issue. Nevertheless, plaintiffs have submitted affidavits from some of the tested officers stating that they found IO-52 testing burdensome, embarrassing, stressful, and degrading. These same officers, like all their NYPD counterparts, are subject to periodic, and even random, drug testing throughout their NYPD careers.

### B. Prior Proceedings

Plaintiffs initially moved for a preliminary injunction barring IO-52 testing during the pendency of this case. The district court denied the motion, finding that plaintiffs were unlikely to succeed on the merits of their Fourth Amendment claim because the challenged warrantless testing was supported by special needs

unrelated to crime control.  See Palladino v. City of New York, No. 07-CV-9264 (GBD), 2008 WL 4539503 (S.D.N.Y. Sept. 30, 2008).  Affirming that decision in Lynch I, this court concluded that IO-52 testing serves multiple purposes.

First, it facilitates "personnel management" by allowing the NYPD quickly to identify and discipline or remove from duty officers who clearly violated NYPD policy by firing their guns while intoxicated.  Lynch I, 589 F.3d at 101.  It also serves this purpose by providing an added deterrent for officers who might consider carrying their firearms while under the influence of alcohol, alerting them that such misconduct is particularly apt to be discovered in the event of a shooting.  See id.

Second, IO-52 testing "promot[es] the NYPD's reputation among New York City residents" by showing that the NYPD takes its alcohol and firearms policies seriously.  Id.  Indeed, Lynch I observed that this purpose is as well served by test results showing that the officer was not under the influence of alcohol—the more common occurrence—as by results showing inebriation.  See id. ("[W]hen an officer fires his or her gun while not under the influence of alcohol, a breathalyzer test assures the public that the officer was fit for duty when he or she chose to fire." (emphasis in original)).

11

Third, IO-52 testing serves criminal law enforcement because "to the extent that a police officer commits a crime by firing his or her gun, the NYPD is charged with investigating that crime, and the breathalyzer program is meant to be one investigatory tool at the NYPD's disposal." Id. at 102.

In light of these multiple purposes, Lynch I identified the "critical question" for special needs analysis to be whether criminal law enforcement was the "'primary purpose'" of IO-52. Id. (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 48 (2000) (emphasis added in Lynch I)). Concluding that it was not, and that personnel management/public confidence purposes predominated, Lynch I ruled that plaintiffs were unlikely to succeed on their Fourth Amendment challenge in light of these special needs. In so ruling, Lynch I clarified that "the mere fact that crime control is one purpose—but not the primary purpose—of a program of searches does not bar the application of the special needs doctrine." Id. (emphasis in original).

Proceeding to evaluate the reasonableness of IO-52 testing by balancing the government's special needs against officers' privacy interests, Lynch I determined that (1) NYPD officers have a "diminished expectation of privacy when it comes to carrying and using firearms," (2) IO-52 breathalyzer testing was

12

minimally intrusive, (3) the NYPD's need to regulate the use of alcohol by armed officers authorized to use deadly force is "manifest," and (4) IO-52 "straightforwardly addresses" that need. Id. at 103–04 (internal quotation marks omitted). Accordingly, because the NYPD's special need to conduct IO-52 testing outweighed the privacy interests advanced by plaintiffs, Lynch I affirmed the district court's denial of a preliminary injunction. See id. at 104.

Further discovery ensued on remand, followed by the parties' cross-motions for summary judgment. Relying on Lynch I's analysis of special needs, the district court concluded as a matter of law that IO-52 testing is constitutionally reasonable and, therefore, granted the NYPD's motion for summary judgment, and denied plaintiffs' parallel motion. See Palladino v. City of New York, 870 F. Supp. 2d at 352–57.

Plaintiffs timely appealed.

II.  **Discussion**

We review an award of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. See Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). We will affirm an award of summary judgment only where there is no genuine issue of material fact, and the

13

moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(a). This is such a case.

A. The "Special Needs" Doctrine

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, see Elkins v. United States, 364 U.S. 206, 213 (1960), states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause," U.S. Const. amend IV. The challenged IO-52 breath testing undoubtedly effects searches subject to the Fourth Amendment. See Maryland v. King, 133 S. Ct. 1958, 1969 (2013) (stating that breathalyzer test, which requires production of lung breath for chemical analysis, is search subject to Fourth Amendment (citing Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616 (1989))). Thus, IO-52 testing must satisfy the Fourth Amendment's "reasonableness" requirement. Id. (collecting cases holding that "ultimate measure of the constitutionality of a governmental search is reasonableness") (internal quotation marks and citation omitted).

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the

14

obtaining of a judicial warrant" supported by probable cause. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995); see Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 619 (stating that "[i]n most criminal cases" reasonableness demands "procedures described by the Warrant Clause of the Fourth Amendment"); Nicholas v. Goord, 430 F.3d 652, 660 (2d Cir. 2005). Even when the warrant requirement is excused, "some quantum of individualized suspicion" is preferred to find a search reasonable. Maryland v. King, 133 S. Ct. at 1969 (internal quotation marks omitted). Nevertheless, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." National Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989); accord Maryland v. King, 133 S. Ct. at 1969 ("Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." (citation omitted)). Warrantless, even suspicionless, searches can be constitutionally reasonable where "special needs, beyond the normal need for law enforcement," are present. Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 619; see National Treasury Emps. Union v. Von Raab, 489 U.S. at 665; United States v. Amerson, 483 F.3d 73, 80–81 (2d Cir. 2007). What generally distinguishes a non-law enforcement need as "special" for

15

Fourth Amendment purposes is its "incompatibility with the normal requirements of a warrant and probable cause, and, especially, the corollary that the nature of the search involved greatly attenuates the risks and harms that the warrant and probable cause requirements are intended to protect against." United States v. Amerson, 483 F.3d at 82.

As this precedent suggests, the "special needs" category of constitutionally permissible warrantless, suspicionless searches is "closely guarded." Chandler v. Miller, 520 U.S. 305, 309 (1997); accord Cassidy v. Chertoff, 471 F.3d 67, 75 (2d Cir. 2006). Thus, to ascertain whether a search program serves special needs beyond normal criminal law enforcement, a court must conduct a "close review of the scheme at issue" in light of "all the available evidence" to determine its "primary purpose." Ferguson v. City of Charleston, 532 U.S. 67, 81 (2001) (internal quotation marks omitted); see also City of Indianapolis v. Edmond, 531 U.S. at 43 (stating particular reluctance "to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends" (emphasis added)).

Primary purpose is determined by reference to the "immediate objective" of the challenged search program, not its "ultimate goal." Ferguson v. City of

16

Charleston, 532 U.S. at 82–83.  Thus, in Ferguson, the Supreme Court ruled that even if the ultimate objective of a challenged drug testing program of pregnant women was to promote the health of those women and the children they bore, such warrantless testing did not fall within the special needs doctrine because its immediate objective was to gather evidence of unlawful drug use in order to use threats of arrest and prosecution as the means to force women who tested positive into treatment.  See id. at 82–84.  By contrast, in Illinois v. Lidster, 540 U.S. 419 (2004), where the immediate objective of a challenged checkpoint was to solicit help from motorists who might have seen a fatal hit-and-run accident, the Supreme Court found such warrantless seizures supported by special needs even though the authorities' ultimate object was to identify and prosecute the driver who caused the accident.  See id. at 424 (recognizing that prohibition on searches conducted pursuant to "general interest in crime control" does "not refer to every law enforcement objective," but only to normal law enforcement (internal quotation marks omitted)).

Relying on Lidster, this court has employed the special needs doctrine to uphold state and federal laws requiring convicted felons to provide DNA samples in order to create databases "to assist in solving crimes should the

17

investigation of such crimes permit resort to DNA testing of evidence." Nicholas v. Goord, 430 F.3d at 668 (upholding New York State law); see United States v. Amerson, 483 F.3d at 81–83 (upholding federal law).  While recognizing that the ultimate objective in creating DNA databases is to solve crimes, see Nicholas v. Goord, 430 F.3d at 669 ("DNA samples may eventually help law enforcement identify the perpetrator of a crime."), this court nevertheless found the warrantless testing supported by special needs because the samplings were not undertaken for the investigation of a particular crime, provided no evidence of wrongdoing in and of themselves, and served an important government interest in obtaining a reliable record of felons' identities.  Nicholas v. Goord, 430 F.3d at 668–69; accord United States v. Amerson, 483 F.3d at 81–82; cf. Maryland v. King, 133 S. Ct. at 1970–75 (upholding DNA searches conducted following arrest for specified felony crimes without specifically relying on special needs doctrine).

The identification of special needs does not, by itself, mean that it is constitutionally reasonable to conduct such searches in the absence of a warrant or individualized suspicion.  That conclusion requires a further finding that the interests served by the special needs outweigh the privacy interests at stake.  See

United States v. Amerson, 483 F.3d at 83; see also Maryland v. King, 133 S. Ct. at 1969.

B.    IO-52 Testing Is Constitutionally Reasonable Under the Special Needs Doctrine

When we apply these principles to this case, the record compels the following conclusions.

First, it is evident that IO-52 testing is conducted to determine an officer's sobriety at the time he discharged his firearm. Sobriety is a fitness-for-duty condition of employment with the NYPD. Thus, a sobriety determination serves special needs distinct from criminal law enforcement, specifically, personnel management of, and maintaining public confidence in, the NYPD. Indeed, these needs must be served in every police shooting case, without regard to whether the shooting implicates the criminal laws, which most police shootings, in fact, do not.

Second, the NYPD's interest in these special needs is not compatible with the warrant requirement applicable to criminal investigations.

Third, the NYPD's interest in these special needs sufficiently outweighs the privacy interests of tested police officers as to render warrantless, suspicionless IO-52 testing constitutionally reasonable.

19

1.      Primary Purpose

Plaintiffs maintain that the district court erred in finding that the NYPD had conclusively proved normal law enforcement not to be the primary purpose of IO-52 testing. Indeed, plaintiffs contend that law enforcement is the central and indispensable feature of IO-52 testing. The record does not admit such a conclusion.

IO-52 testing determines sobriety. In the case of a police officer who has just discharged his or her firearm, the immediate object of such a mandatory sobriety determination is not criminal law enforcement as plaintiffs assert. Indeed, nothing in the record indicates that IO-52 testing is premised on any assumption that every time a police officer discharges his firearm causing death or personal injury he commits a crime. Cf. Nicholas v. Goord, 430 F.3d at 675 (noting "usual law-enforcement circumstance" where search is "motivated by suspicion that the person being searched was involved in any unsolved crime"). Nor does IO-52 testing itself indicate criminal behavior. The ingestion of alcohol—unlike the ingestion of illegal drugs, for which police officers are routinely tested—is not, after all, criminally proscribed. Moreover, an officer whose breathalyzer results are above .08 may well have discharged his firearm

20

lawfully, for example, to stop a life-threatening crime.[3]  Meanwhile, an officer with test results below .08 may have discharged his firearm unlawfully, for example, to commit premeditated murder.  In short, even if IO-52 test results might <u>ultimately</u> provide evidence relevant to a criminal prosecution—something that has never occurred to date—the record does not here admit a conclusion that the <u>immediate</u> object of IO-52 testing is the procurement of criminal evidence in order to prosecute the police officer in question.  <u>Cf.</u> <u>Ferguson v. City of Charleston</u>, 532 U.S. at 82 (concluding that immediate objective of searches was to generate evidence for arrest and prosecution of drug-abusing mothers).

Rather, what the record does show is that the immediate purpose of IO-52 testing is personnel management of, and the maintenance of public confidence in, the NYPD, specifically with respect to officers' discharge of firearms in circumstances causing death or personal injury.[4]  The Supreme Court has

---

[3] The one officer who registered above .08 on the initial breathalyzer test (though presumably less than .08 upon further Intoxilyzer testing) was ultimately commended for his actions in the discharge of his firearm.

[4] Plaintiffs contend that Chief Campisi's declaration as to the purposes of IO-52 merits no weight because it post-dates the Committee of Review's recommendation and does not state its reasoning.  We disagree.  Chief Campisi chaired the Committee and, therefore, has personal knowledge of the process by

21

specifically recognized a public employer's regulation of its employees' conduct as a special need that can support warrantless, suspicionless testing to ensure safe and responsible performance of hazardous duties, a conclusion that obtains without regard to whether the testing occurs before or after any harm actually occurs and whether the employer is itself involved in law enforcement. See National Treasury Emps. Union v. Von Raab, 489 U.S. at 679 (recognizing special need to conduct suspicionless drug testing of Customs employees involved in drug interdiction or required to carry firearms); Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 620–21 (recognizing special need to conduct blood and urine tests of all railroad employees involved in train accidents). Breathalyzer testing most obviously serves these special needs by promptly revealing whether a police officer was in compliance with department guidelines respecting alcohol use and fitness for duty when he discharged his firearm. The NYPD and the public have an interest in the answer to that question in every police shooting resulting in death or personal injury, without regard to whether the officer's conduct raises any criminal concerns. As this court observed in Lynch I, "when an officer fires his or her gun while not under the influence of alcohol, a

which it came to recommend the challenged mandatory breathalyzer testing. Moreover, plaintiffs have adduced no evidence contradicting Chief Campisi's assertions.

22

breathalyzer test assures [both supervising officers and] the public that the officer was fit for duty when he or she chose to fire."  589 F.3d at 101 (emphasis in original).  At the same time, if an officer fires his gun while intoxicated, IO-52 breath testing provides objective evidence of "a clear violation of NYPD policy," allowing for the officer to be "quickly disciplined" or even "removed from duty," administrative actions that serve to maintain both an effective police force and public confidence in that force.  Id. (noting that IO-52 testing shows "public that the NYPD takes seriously its policies regarding alcohol and firearms").

IO-52 testing also serves the special needs of personnel management and public confidence by providing an added deterrent to officers who might otherwise consider carrying their firearms while unfit for duty due to alcohol. Plaintiffs submit that deterrence is not the immediate object of IO-52 testing and, in any event, the infrequency of such testing makes it an ineffective means of detecting and deterring excessive alcohol use by police officers.  The argument is unconvincing.  While deterrence is generally achieved in the long run, the immediacy of that objective to NYPD personnel management and public confidence needs is evident from the fact that the policy alerts every police officer and the public that IO-52 testing will be conducted, without exception,

23

every time an officer discharges his firearm causing death or personal injury. As the Supreme Court has observed in recognizing deterrence as a special need supporting the suspicionless testing of railroad employees after train accidents, policies alerting "employees in safety-sensitive positions [that] they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, . . . significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct, concomitantly increasing the likelihood that employees will forgo using drugs or alcohol while subject to being called for duty." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 630 (internal citation omitted).

Thus, both by promptly determining whether officers who discharged their firearms were in compliance with NYPD fitness-for-duty requirements and by deterring officers generally from carrying firearms when not sober, IO-52 testing serves personnel management and public confidence needs distinct from normal law enforcement.[5]

---

[5] The special need of public employers to conduct deterrent testing of employees engaged in safety-sensitive tasks, see Skinner v. Ry. Execs.' Ass'n, 489 U.S. at 620, even without a documented record of abuse, see National Treasury Emps. Union v. Von Raab, 489 U.S. at 668 (upholding drug testing of Customs officials without any documented history of drug abuse, in part, because of their performance of safety-sensitive tasks), does not necessarily extend to non-employment contexts,

Plaintiffs nevertheless contend that <u>Ferguson v. City of Charleston</u>, 532 U.S. at 84, precludes a finding of special needs when, as in the case of IO-52 testing, there is "extensive involvement of law enforcement officials at every stage" of the program.  This argument overlooks important distinctions between <u>Ferguson</u> and this case.  Specifically, <u>Ferguson</u> did not arise in an employment context, much less one where the tested employees occupied safety-sensitive positions.  Further, as we have already explained <u>supra</u> at 16–17, the immediate purpose of the testing program at issue in <u>Ferguson</u> was the "arrest and prosecution" of the pregnant women who tested positive for drugs.  <u>Id.</u> (internal quotation marks omitted).  It was in that context that the Court concluded that extensive law enforcement involvement in drug testing by a public hospital precluded a finding of special need.  <u>Id.</u> at 85–86.

Here, the immediate object of IO-52 testing is not to arrest or prosecute the police officer who discharged his firearm but, rather, to confirm—for his employer and the public—that the officer was fit for duty when he fired his gun.  While every IO-52 test to date has provided such confirmation of fitness, if the results were otherwise, they would provide the objective ground necessary for

<hr/>

see <u>Chandler v. Miller</u>, 520 U.S. at 322 (striking down drug testing of candidates for state office in absence of demonstrated need for deterrence).

the employer to order appropriate administrative discipline. Positive results would not, however, necessarily support criminal prosecution. Thus, while the NYPD certainly controls IO-52 testing, it does so first and foremost as the public employer responsible for overseeing its officers' use of authorized firearms and for assuring the public of that oversight.

In urging otherwise, plaintiffs emphasize that the language of IO-52 identifies its purpose as to "ensure the highest levels of integrity at the scene" of police shootings, IO-52, J.A. 45 (emphasis added), that the NYPD employs the same procedures with respect to the site of police shootings as it employs at crime scenes, and that Chief Campisi acknowledged that police shooting sites are treated as crime scenes "to ensure prosecution," Campisi Decl. ¶ 45, J.A. 99. When reviewed in context of the record as a whole, however, these facts cannot support a conclusion that the NYPD's immediate purpose in using certain criminal procedures at the site of a police shooting—much less its immediate purpose in mandating breathalyzer testing—is to solve a crime. Rather, the record indicates that the immediate objective of these practices is to assure the public that every investigation into a police shooting is conducted with the greatest rigor. Id. ¶¶ 33, 70, J.A. 99, 104. Such assurance is essential to

26

maintaining public confidence that police officers, armed and authorized to use deadly force, do so consistently not only with the law but also with NYPD training and guidelines. Indeed, the immediate importance of rigorous investigation to ensuring public confidence in the NYPD rests not on the fact that in rare instances police officers may be prosecuted for discharging their firearms but on the fact that in the vast majority of cases they will not be prosecuted. Thus, the full record demonstrates that ensuring the "integrity at the scene," as that phrase is used in IO-52, serves the immediate purpose of promoting public confidence in the overall investigation, not of conducting regular, routine law enforcement.

In sum, the record compels the conclusion that the primary, i.e., immediate, purpose of IO-52 testing is personnel management and the maintenance of public confidence in the NYPD, needs present in every shooting case and distinct from normal law enforcement objectives to solve crimes and prosecute their perpetrators. In these circumstances, the possibility that IO-52 test results might ultimately be used as evidence in a criminal prosecution does not take the case out of the special needs doctrine. See Illinois v. Lidster, 540 U.S.

27

at 423–27; <u>United States v. Amerson</u>, 483 F.3d at 80–83; <u>Nicholas v. Goord</u>, 430 F.3d at 667–69.

        2.    <u>Incompatibility of the Identified Special Needs with the Warrant Requirement</u>

For non-law enforcement objectives to qualify as "<u>special</u> needs," a court must conclude that those needs are incompatible with the usual warrant and probable cause requirements and "not needed to prevent the mischief" that those requirements "are designed to prevent." <u>United States v. Amerson</u>, 483 F.3d at 82 (internal quotation marks omitted) (emphasis added). In making that determination, we start with the Supreme Court's observation that "[a] warrant serves primarily to advise the citizen that an intrusion is authorized by law and limited in its permissible scope and to interpose a neutral magistrate between the citizen and the law enforcement engaged in the often competitive enterprise of ferreting out crime." <u>National Treasury Emps. Union v. Von Raab</u>, 489 U.S. at 667 (internal quotation marks omitted). Thus, the Court has held that where "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically" and "are well known to covered employees," there is little need for a warrant. <u>Id.</u> (alteration and internal quotation marks omitted). Indeed, that conclusion is most apt when the

28

challenged testing is mandatory and admits no exercise of discretion. See Maryland v. King, 133 S. Ct. at 1969 ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the interpolation of a neutral magistrate between the citizen and the law enforcement officer.") (internal quotation marks omitted); United States v. Amerson, 483 F.3d at 82 (observing that lack of discretion removes "significant reason for warrants—to provide a check on the arbitrary use of power").

The circumstances triggering mandatory IO-52 testing are narrowly and specifically defined. IO-52 applies only when (1) an on- or off-duty NYPD officer discharges his firearm (2) within the City of New York (3) resulting in death or injury to a person. When these circumstances are present, IO-52 mandates that an IAB Duty Captain respond to the scene of the shooting and administer a standardized breathalyzer test to each officer who discharged his firearm. The policy affords the IAB Duty Captain no discretion in determining whether to administer the test; he must do so. Moreover, as is evident from the very fact of this lawsuit, brought by the union representing the vast majority of NYPD officers, officers are aware that they are subject to such mandatory testing. Thus, here, "a warrant would provide little or nothing in the way of additional

29

protection of personal privacy" to NYPD officers. <u>National Treasury Emps. Union v. Von Raab</u>, 489 U.S. at 667. "Indeed, in light of the standardized nature" of IO-52 testing, and the "'minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate.'" <u>Maryland v. King</u>, 133 S. Ct. at 1970 (quoting <u>Skinner v. Ry. Labor Execs.' Ass'n</u>, 489 U.S. at 622).

The Supreme Court has further recognized that "the government's interest in dispensing with the warrant requirement is at its strongest when, as here, the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." <u>Skinner v. Ry. Labor Execs.' Ass'n</u>, 489 U.S. at 623 (internal quotation marks omitted). Because "alcohol and other drugs are eliminated from the bloodstream at a constant rate, . . . breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible." <u>Id.</u> (internal citation omitted). Thus, a delay associated with obtaining a warrant could negatively affect the probative value of breathalyzer test results, undermining the NYPD's ability both to manage its personnel effectively and to assure the public that it is doing so. <u>See</u> <u>id.</u> (observing that delay in procuring warrant "may result in the destruction of

30

valuable evidence"); see also Missouri v. McNeely, 133 S. Ct. 1552, 1560 (2013) (observing that "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results").[6]

Accordingly, we conclude that the primary non-law enforcement objectives of IO-52 testing—personnel management of and public confidence in the NYPD—are properly deemed "special needs" in that they are incompatible with the general warrant/individualized suspicion requirements and, further, that the mandatory, narrow, and specific nature of IO-52 testing greatly ameliorates the mischief that the warrant/individualized suspicion requirements were designed to prevent.

---

[6] McNeely made this observation in a criminal case, not one presenting special needs distinct from law enforcement. In that context, it concluded that metabolization of alcohol in the bloodstream does not establish "a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." 133 S. Ct. at 1556. Rather, exigency would have to be determined "case by case based on the totality of the circumstances." Id. Contrary to plaintiffs' assertion, however, McNeely does not demonstrate that a warrant or individualized suspicion is required in cases presenting special needs apart from law enforcement. Indeed, McNeely cited approvingly to Skinner in observing that "medically drawn blood tests are reasonable in appropriate circumstances," id. at 1565, and nowhere questioned Skinner's conclusion that insistence on the warrant requirement would frustrate the suspicionless testing regime at issue in that special needs case.

31

3.	Reasonableness

The fact that a challenged search program is supported by special needs does not, by itself, establish the reasonableness of searches conducted thereunder.  See Illinois v. Lidster, 540 U.S. at 83.  That determination can only be made through a "context-specific" assessment of the special needs as weighed against the privacy interest affected.  Chandler v. Miller, 520 U.S. at 314; accord United States v. Amerson, 483 F.3d at 83.   This court has traditionally conducted that assessment by reference to three factors:  "(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs."  Cassidy v. Chertoff, 471 F.3d at 75 (internal quotation marks omitted); accord United States v. Amerson, 483 F.3d at 83–84.  Plaintiffs submit that the balance tips in their favor and, thus, IO-52 testing is constitutionally unreasonable.  We conclude, however, that the pertinent factors all weigh in favor of the NYPD.

First, because NYPD officers are authorized to carry firearms and to use deadly force, they have a diminished expectation of privacy in employer testing that ensures their fitness for duty.  The Supreme Court has generally recognized

32

that the "'operational realities of the workplace may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts.'" Maryland v. King, 133 S. Ct. at 1978 (quoting National Treasury Emps. Union v. Von Raab, 489 U.S. at 671). With particular reference to public employees required to carry firearms in the line of duty, the Court has held that, "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from [their employers] personal information that bears directly on their fitness." National Treasury Emps. Union v. Von Rabb, 489 U.S. at 672; see id. at 671 (observing that public should not have to bear the risk that armed officers may employ deadly force while suffering "from impaired perception and judgment"). Thus, plaintiffs cannot claim that police officers who actually discharge their firearms, causing death or personal injury, have a strong privacy interest in avoiding IO-52 testing to confirm their fitness for duty.

Second, the nature of the challenged intrusion, breath testing, is one that the Supreme Court has recognized not to "implicate[] significant privacy concerns." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 626; see Maryland v. King, 133 S. Ct. at 1969 ("The fact that an intrusion is negligible is of central

33

relevance to determining reasonableness."). Such tests are obviously less invasive than blood sampling, in that they "do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment." Skinner v. Ry. Labor Executives Ass'n, 489 U.S. at 625. Breath tests are also less invasive than urine tests, which may require observation of a function "traditionally shielded by great privacy." Id. at 626.

In urging us nevertheless to weigh this factor in their favor, plaintiffs rely on affidavits submitted by police officers subjected to IO-52 testing who state that the tests were degrading and traumatic, especially in the immediate aftermath of a shooting. Plaintiffs fail, however, to explain why IO-52 testing is any more traumatic or intrusive than the drug, urine, and blood testing of railroad employees following train accidents that the Supreme Court held minimally intrusive in Skinner. See id. IO-52 specifically instructs that the initial breathalyzer test be performed in a "private setting" and in a "dignified, respectful fashion." IO-52, J.A. 46. There is no record basis to think that a five-minute breath test conducted under such circumstances imposes a significant burden on officers.[7] Nor does the record indicate that IO-52 testing "threaten[s]

_____

[7] Plaintiffs do not contend that a subsequent Intoxilyzer test is any more intrusive than the five-minute breathalyzer test. In any event, Intoxilyzer testing is

34

the safety or health" of the officers tested. <u>Maryland v. King</u>, 133 S. Ct. at 1979 (identifying physical danger as "crucial factor" when "analyzing magnitude of intrusion" (internal quotation marks omitted)). IO-52 requires officers to remain at the scene of the shooting for breathalyzer testing only when "consistent with safety." IO-52, J.A. 45. Plaintiffs' identification of a single incident when hospitalized officers were allegedly denied water prior to the administration of the breathalyzer test is insufficient to admit an inference that IO-52 testing so inherently jeopardizes officer safety as to preclude warrantless administration. In sum, because the intrusion caused by breath testing is negligible, this factor also weighs in favor of reasonableness.

Third, the NYPD's need promptly to confirm that officers who discharged firearms were then fit for duty is manifest, and IO-52 directly addresses that need. NYPD officers "who may use deadly force plainly 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.'" <u>National Treasury Emps. Union v. Von Raab</u>, 489 U.S. at 670 (quoting <u>Skinner v. Ry. Labor Execs.' Ass'n</u>, 489 U.S. at 628)). Thus, as this court stated in <u>Lynch I</u>, "the NYPD's regulations involving

conducted only after a breathalyzer test provides individual suspicion of intoxication. Thus, if IO-52 breathalyzer testing is reasonable, so too is subsequent Intoxilyzer testing.

35

alcohol and firearms are vital to public safety," 589 F.3d at 104, and the NYPD has a substantial interest, when officers discharge their firearms, in promptly confirming for itself and the public that officers were in compliance with those regulations, as well as in detecting and disciplining officers who were not, see id. at 101. Indeed, when IO-52 testing promptly eliminates the influence of alcohol in a police shooting, the NYPD can more readily consider whether any concerns raised by the shooting suggest the need for other administrative action, such as better training. See Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 630 (recognizing that negative drug test results for railway employees after train accident "would help establish the significance of equipment failure, inadequate training, or other potential causes").

Plaintiffs argue that the NYPD was required to show that less-intrusive, suspicion-based testing was impractical before implementing suspicionless testing under IO-52. They note that Chief Campisi himself initially supported a suspicion-based testing policy, although that view was not adopted by the Committee of Review in recommending mandatory breath testing in all shooting cases. We need not discuss this point at length because the Supreme Court has "repeatedly refused to declare that only the least intrusive search practicable can

be reasonable under the Fourth Amendment" in the context of special needs. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 663 (internal quotation marks omitted). Plaintiffs' complaint is that such a shooting, by itself, provides no basis for suspecting the individual officer of having fired under the influence of alcohol. But, as we have observed throughout this opinion, the object of IO-52 testing is not simply to identify officers who discharged their firearms under the influence of alcohol; it is also to provide police supervisors and the public with prompt assurance that a shooting officer's actions were not influenced by alcohol, i.e., that he was fit for duty when he fired his weapon. Limiting breathalyzer testing to officers specifically suspected of intoxication not only fails effectively to provide such objective evidence of fitness, it effectively "transforms the [breath testing] process into a badge of shame," which is not consistent with the special needs at issue. Id.; see also id. at 664 (observing that suspicion based testing "would not be better, but worse," given the special needs at issue).

The same flaw informs plaintiffs' contention that IO-52 testing is not necessary because the NYPD has other equally or more effective means in place to detect violations of its alcohol policies, for example, observation by fellow officers trained to detect intoxication. Such subjective assessments, even by

37

trained officers, are unlikely to inspire the same public confidence as an objective breath test in determining whether a shooting officer was or was not under the influence of alcohol. In any event, our task is not to determine whether IO-52 is "optimally effective, but whether it [is] reasonably so." Cassidy v. Chertoff, 471 F.3d at 85.

Having carefully weighed the relevant factors in the specific context of this case, we conclude that the NYPD's special need to manage a force of officers authorized to carry firearms and to use deadly force, as well as its special need to maintain public confidence in the NYPD, outweigh the privacy interests of a police officer who has discharged his firearm so as to cause death or personal injury with respect to undergoing the negligible intrusion of breathalyzer testing.

Accordingly, we conclude that warrantless, suspicionless IO-52 breath tests are supported by special needs and constitute reasonable searches under the Fourth Amendment. The district court therefore correctly entered summary judgment in favor of the NYPD.

### III.  Conclusion

To summarize, we conclude that the record compels the following conclusions:

1.  The immediate objectives of IO-52 testing are personnel management of, and public confidence in, the NYPD.

2. The identified objectives qualify as "special needs" for purposes of Fourth Amendment reasonableness review because they are distinct from normal law enforcement concerns and incompatible with the warrant and probable cause requirements for law enforcement searches.

3. The aforementioned special needs greatly outweigh officers' reduced expectation of privacy with respect to alcohol testing at the time of any firearms discharge causing death or personal injury, thereby rendering warrantless, suspicionless IO-52 testing constitutionally reasonable as a matter of law.

The district court's award of summary judgment to the NYPD on plaintiffs' Fourth Amendment challenge to IO-52 is AFFIRMED.